**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| [UNDER SEAL] | § § § § § § § § § § § § | **FILED IN CAMERA**<br>**AND UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730**<br><br>**DO NOT ENTER INTO PACER**<br><br>**DO NOT PLACE IN PRESS BOX** |
| vs. |  |  |
| [UNDER SEAL] |  |  |

# FILED UNDER SEAL

FILED
IN CLERKS OFFICE

U.S. DISTRICT COURT
DISTRICT OF MASS.

2020 NOV 25  AM 9:20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* David Berteletti, | §<br>§<br>§ | |
| | § | Civil Action No. _____ |
| Plaintiffs, | §<br>§ | |
| vs. | §<br>§ | JURY TRIAL DEMAND |
| | § | |
| KABBAGE, INC., | § | |
| KABBAGE PAYMENTS LLC, | § | **FILED IN CAMERA** |
| AND DOES 1-50, | § | **AND UNDER SEAL** |
| | § | **PURSUANT TO** |
| Defendants. | § | **31 U.S.C. § 3730** |
| | §<br>§ | |
| | § | **DO NOT ENTER INTO PACER** |
| | §<br>§ | |
| | § | **DO NOT PLACE IN PRESS BOX** |
| | §<br>§ | |

U.S. DISTRICT COURT
DISTRICT OF MASS.
2020 NOV 25 PM 9: 59
FILED
IN CLERKS OFFICE

## COMPLAINT

1. *Qui Tam* Relator, David Berteletti, brings this action on behalf of the United States of America and himself to recover damages and penalties from the Defendants under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

2. Defendants have knowingly submitted and caused the submission of false claims for approval and payment in the form of Paycheck Protection Program ("PPP") Lender and Agent processing fees, PPP loan applications, PPP loan forgiveness applications to the U.S. Small Business Administration ("SBA"), and loan applications to the Federal Reserve Banks. In so doing, Defendants violated the False Claims Act.

3.  As detailed herein, Defendants fraudulently completed thousands of PPP loan application forms by inflating the base calculations on which each borrower's PPP loan amount, and the Defendants' PPP processing fees, were based.  Specifically, Defendants knowingly completed and submitted for approval and payment PPP loan applications that improperly added the amount of borrowers' state and local income tax withholdings on top of gross wages, thereby inflating each completed PPP loan application by amounts specifically excluded by the PPP legislation and PPP loan application rules.  These actions significantly inflated the amount of each affected borrower's loan when it was approved by the SBA. The fraudulently inflated loan amounts, in turn, resulted in Defendants seeking and receiving PPP processing fees in amounts greater than those to which they were entitled. Forgiveness of the inflated loan amounts also serves as a fraudulent basis for the SBA to reimburse Kabbage the full amount of each forgiven loan.

4.  In the less than five months of the PPP's existence, nationwide Kabbage processed approximately $7 billion in PPP loans, drew on the Federal Reserve's PPP Loan Facility for nearly $1.52 billion, and, it is estimated, sought and received more than $330 million dollars in fees from the PPP in loan processing fees for loans processed nationwide.

5.  Based on currently available federal PPP borrower data, Kabbage served as an SBA PPP Lender for more than 2,900 PPP loans for Massachusetts businesses alone.  The Massachusetts loans have a minimum value of more than $50 million dollars.

6.  As a result of the Defendants' actions, the government (1) paid Defendants PPP loan processing fees based upon fraudulently inflated PPP loan applications, (2) approved and funded loans based on fraudulently inflated PPP loan applications, (3) approved and funded loans based on fraudulently inflated PPP loan applications in an amount hundreds of

2

millions of dollars more than it would have had the applications contained the correct information. Further, Defendants' actions causes faultless borrowers to seek forgiveness for the fraudulently inflated PPP loans they received, which causes the SBA to approve and reimburse Kabbage for the value of the forgiven loans, causing further harm to the government.

7. Kabbage further defrauded the government when it borrowed nearly $1.52 billion from the Federal Reserve's emergency PPP Loan Facility by pledging inflated PPP loan values as collateral for government funds.

8. In short, purely for their own financial gain, Defendants committed a fraud of opportunity during the most significant public health crisis of the last generation. At all times, as described herein, Defendants' actions were knowing and willful.

## JURISDICTION AND VENUE

9. This action arises under the United States Civil False Claims Act ("FCA"), 31 U.S.C. §. 3729, et seq.

10. This Court has jurisdiction of the subject matter of this action pursuant to 31 U.S.C. §. 3732(a) and U.S.C. §1331 and has personal jurisdiction over the Defendants because Defendants transact business in this District.

11. Venue is proper in this District under 28 U.S.C. §. 1391 and 31 U.S.C. §. 3732(a) because Defendants transact business in this District and acts violative of the FCA occurred in this District.

12. Relator is the original source of these allegations and has direct and independent knowledge of the information herein within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

3

13. Relator denies that there has been a public disclosure or that the facts alleged herein have been publicly disclosed in any Federal criminal, civil, or administrative hearing in which the Government or its Agent is party in a Congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation.

14. Should any public disclosure have occurred, unbeknownst to Relator, prior to the filing of this Complaint, Relator's knowledge is independent of such disclosure and Relator's knowledge would materially add to any public allegations or information.

15. Prior to filing this Complaint, Relator voluntarily disclosed to the United States the information on which his allegations are based.

## PARTIES

16. Relator, David Berteletti, is a citizen of the United States and the Commonwealth of Massachusetts. Mr. Berteletti has over 40 years of experience servicing the tax and accounting needs of successful closely held businesses. He has extensive experience dealing with service-related industries, high net worth individuals and issues concerning wealth and estate planning. Mr. Berteletti holds a CPA license from the Massachusetts Board of Public Accountancy. He received a bachelor's degree in Management with an Accounting concentration from Boston College. He also earned a master's degree in Taxation from Bentley College. He is also a member of the American Institute of Certified Public Accountants and the Massachusetts Society of Certified Public Accountants.

17. Defendant, Kabbage, Inc., is an Atlanta-based financial technology ("Fintech") company with a principal office located at 925B Peachtree Street NE, Suite 1688, Atlanta, GA 30309, and additional offices located in San Francisco, CA, Denver CO, and New York, NY. Defendant Kabbage Payments, LLC is a Delaware corporation and is Kabbage's registered

payment service provider and payment facilitator. Collectively, Kabbage Inc. and Kabbage Payments, LLC are referred to herein as "Kabbage."

18. Kabbage was originally founded to provide small businesses a way to access short-term lines of credit for under $250,000, and primarily for those with mediocre credit. On its website, www.kabbage.com, Kabbage describes its business as: "Supporting small businesses is our business. We're leveling the playing field with big cash flow solutions for small businesses."

19. As described herein, Kabbage acted as both a Lender Service Provider ("Agent") and approved Lender pursuant to the PPP for hundreds of thousands of small businesses, including businesses and borrowers in Massachusetts.

20. As alleged herein, prior to becoming an SBA-approved Lender, Kabbage acted as an Agent completing PPP loan applications on behalf of hundreds of banks and financial institutions throughout the United States (the "DOES" alleged herein).

**REGULATORY BACKGROUND**

I. **The Paycheck Protection Program**

21. In response to the devastating social and economic effects of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") on March 27, 2020.

22. Included in the CARES Act legislation was the Paycheck Protection Program ("PPP"), created under a new section – section 7(a)(36) - of the Small Business Act of 1953. The PPP initially provided $349 billion in financial assistance to businesses in the form of forgivable loans to help those businesses continue operating during the COVID-19 crisis. The loans were backed 100% by the Small Business Administration ("SBA").

23. Within weeks of passage of the CARES Act the $349 billion in forgivable PPP loan guarantees available to businesses was exhausted. As a result, Congress added an additional $310 billion to PPP funding on April 24, 2020, bringing the total to $659 billion. The PPP closed as of August 8, 2020 with approximately $130 billion remaining, and has not been reauthorized as of the date of this Complaint.

24. In addition to Congress's funding for the SBA, on April 16, 2020 the Federal Reserve used its own emergency powers pursuant to Section 13(3) of the Federal Reserve Act to supply direct liquidity to participating financial institutions through term financing. Known as the "Paycheck Protection Program Liquidity Facility" ("PPPLF"), the Federal Reserve provided non-recourse loans to any lender who was eligible to originate PPP loans. This direct injection of cash to Lenders ensured that all lenders who wanted to participate in the PPP would have enough funds to provide PPP loans.

25. PPP Lenders that obtained PPPLF funds from the Federal Reserve pledged their PPP loans at face value as collateral. Lenders could access the PPPLF for an amount up to the principal amount of PPP loan collateral they pledged to the Federal Reserve. Lenders borrowed the money from the Federal Reserve though the discount window at a fixed rate of 35 basis points (.35%).

26. As alleged herein, Kabbage applied for and drew on the PPPLF for at least $1.52 billion in loans from the Federal Reserve. The Federal Reserve monies provided to Kabbage were in turn used to directly fund the PPP loans for Kabbage's customers.

27. The purpose of the PPP was to help small businesses meet payroll and continue operating during the unprecedented economic effects of the Coronavirus pandemic. According to the SBA's PPP website:

"The Paycheck Protection Program is a loan designed to provide a direct incentive for small businesses to keep their workers on the payroll. SBA will forgive loans if all employee retention criteria are met, and the funds are used for eligible expenses."

28. PPP rules provide that PPP loans are forgivable in full if a borrower used at least 60% of the loan for eligible payroll costs over a span of 24 weeks. Non-payroll costs such as mortgage interest, business rent, and utilities are also eligible for forgiveness. PPP Lenders, like the Defendants, are directly reimbursed by the SBA for the amount of PPP loans provided to borrowers if the borrower's PPP funds were used for the appropriate purposes and therefore subject to forgiveness.

29. The PPP was intended to provide a streamlined, uniform process where small businesses could easily connect with SBA-approved Lenders (and other Lenders) to qualify for and receive the much-needed Congressionally approved funds.

30. With certain exceptions not relevant to the allegations in this Complaint, PPP funds were available to any U.S.-based business with fewer than 500 employees per location; sole proprietors, independent contractors, self-employed persons; 501(c)(3) non-profit organizations, 501(c)(19) veterans organizations, and Native American Tribal business concerns.

31. PPP loans have an interest rate of 1%. Loans issued prior to June 5, 2020 have a maturity of two years, whereas loans issued after June 5, 2020 have a maturity of five years. In addition, loan payments will be deferred for six months, no collateral or personal guarantees were required to obtain the loans, and neither the government nor Lenders were allowed to charge small businesses any fees for the loan application or processing.

32. Proceeds of the loans could be used to pay certain business expenses, including payroll costs, costs related to the continuation of healthcare benefits and insurance premiums, employee salaries and commissions, interest on mortgage obligations, rent and utility

7

payments, interest on debt incurred before February 15, 2020, and refinancing an SBA Economic Injury Disaster Loans ("EIDL") made between January 31, 2020 and April 3, 2020.

33.     The PPP legislation also allowed entities to assist with PPP loan applications as "Agents" in conjunction with an SBA approved Lender. Pursuant to the government's PPP Information Sheet, "Agents," also known as "Lender Service Providers," ("LSPs") included consultants, accountants, attorneys, and "someone who assists a Lender with originating, disbursing, servicing, liquidating, or litigating SBA loans; a loan broker; or any other individual or entity representing an applicant by conducting business with the SBA."

34.     While the PPP loans were administered by SBA and originated by third-party Lenders and Agents, borrowers were not allowed to submit applications for PPP loans directly to the SBA, making the use of an approved Lender or Agent necessary.

35.     The PPP waived several normal SBA loan requirements, including borrower, Lender, and prepayment fees, and the requirement that borrowers also have available credit. The Federal Government issued specific guidance related to the PPP to assist the lending process.

## II.     SBA Lenders and Agents

36.     Pursuant to the SBA's April 15, 2020 Interim Final Rule ("April 15 IFR" or "Paycheck Protection Program Rule"), the SBA was authorized to guarantee loans under the PPP through June 30, 2020 and all SBA Section 7(a) Lenders were automatically approved to make PPP loans on a delegated basis. The loan guarantee period was extended further to August 8, 2020.

37. SBA 7(a) Lenders are those institutions qualified to administer loans to small businesses. The stated purpose of SBA 7(a) loans is to encourage Lenders to provide fair loans to businesses that might not otherwise obtain funding on reasonable terms and conditions by having the government guarantee most of the loan amount. SBA 7(a) loans are provided by private Lenders – usually banks – that are approved by the SBA. Once issued, loans are then partially guaranteed by the SBA (up to 85% for non-PPP loans).

38. Generally, in order to become a 7(a) Lender, an institution must meet the following SBA criteria: have a continuing ability to evaluate, process, close, disburse, service, and liquidate small business loans; be open to the public to issue loans (and not be a financing subsidiary, engaged primarily in financing the operations of an affiliate); have continuing good character and reputation, and otherwise meet and maintain the ethical requirements as identified in 13 CFR Part 120.140; and be supervised and examined by a state or federal regulatory authority, satisfactory to the SBA.

39. In response to the extraordinary circumstances posed by COVID-19, the SBA provided in its April 15 IFR that the authority to make PPP loans could be extended to additional non-7(a) Lenders determined by the Administrator and the Secretary to have the necessary qualifications to process, close, disburse, and service loans made with the 100% SBA guarantee.

40. These included any federally insured depository institution or any federally insured credit union who was not designated in "Troubled Condition" by its primary Federal regulator, as well as any depository or non-depository financing provider that:

    a. Originates, maintains, and services business loans or other commercial financial receivables and participation interests;

9

b. Applies the requirements of Bank Secrecy Act;

c. Has been operating since February 15, 2019; and

d. Has originated, maintained or serviced at least $50,000,000 in business loans or other commercial receivables during a consecutive 12 month period in the last 36 months;

e. Or is a service provider to any insured depository institution that has a contract to support such institution's lending activities in accordance with 12 USC 1867(c) and is in good standing with the appropriate federal banking agency.

41. Non-Bank and Non-Insured Depository institutions wishing to participate in the PPP that were not previously SBA Lenders but met the criteria set forth above were required to apply to the SBA. These application materials included Form 3507, the "CARES Act Section 1102 Lender Agreement – Non-Bank and Non-Insured Depository Institution Lenders."

42. Form 3507 required the non-bank institution to affirmatively attest to the above criteria necessary to become a Lender and to:

a. "Assume all obligations, responsibilities, and requirements associated with delegated processing of covered loans made under the Paycheck Protection Program;

b. For purposes of making covered loans to an eligible recipient under the Paycheck Protection Program, Lender is responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan;

c. To the best of its knowledge, Lender certifies that it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements;

d. That any false statements made to the U.S. Small Business Administration and Department of the Treasury can result in criminal prosecution under 18 U.S.C. 1001, 15 U.S.C. 645, and other provisions and imposition of civil money penalties under 31 U.S.C. 3729."

43. Form 3507 defined "PPP Loan Program Requirements" as the term "Loan Program Requirements" is defined in 13 CFR § 120.10. That definition, in turn, states that such Requirements include "official SBA notices and forms applicable to the 7(a) Loan Program," of which the PPP is a part. In its Form 3507 certification, Kabbage was therefore required to "maintain compliance" with any official SBA Notice regarding the PPP.

### III.    PPP Lender and Agent Processing Fees

44. Approved PPP Lenders and their approved Agents earned fees from the SBA for processing PPP loans.

45. As described below, Kabbage and the DOES earned fees from the PPP in two ways: first, as an Agent of authorized SBA Lenders and, second, as a SBA-approved direct Lender to businesses. Lenders and Agents were not allowed to collect any fees from the borrower and were instead compensated directly by the SBA.

46. Kabbage completed and caused to be submitted PPP loan applications as an Agent on behalf of approved SBA Lenders from approximately April 7, 2020 through May 18, 2020.

Kabbage completed and submitted PPP loan applications as an SBA Lender from at least May 18, 2020 until August 8, 2020.

47. Under the terms of the PPP, the SBA compensated Lenders for processing based on the principal amount of the Loan at the time of disbursement -- according to the following schedule:

   a. 5% for loans of not more than $350,000;

   b. 3 % for loans of more than $350,000 and less than $2,000,000;

   c. 1% for loans of at least $2,000,000.

48. Under the PPP, Agents were not allowed to collect fees from the borrowers. Instead, Agents were paid by the Lender out of the Lender's own processing fees, reducing the Lender's fee by the percentage paid to its Agent. The total amount an Agent could collect from the Lender for the preparation and processing of a PPP loan application (including the referral of a borrower to the Lender) could not exceed:

   a. 1% for loans of not more than $350,000;

   b. 0.5% for loans of more than $350,000 and less than $2 million; and

   c. 0.25% percent for loans of at least $2 million.

49. Thus, within each strata of loan amount, whether acting as Agent or Lender, the Defendants' PPP fees increased in direct proportion to the amount of each borrower's loan. The greater the loan, the greater the fee.

50. To receive their processing fees, Lenders were required to follow the May 21, 2020 SBA Procedural Guidance Notice ("May 21 Notice"). The May 21 Notice is a "PPP Loan Program Requirement" pursuant to 13 CFR § 120.10 because it is an official SBA Notice and form applicable to the 7(a) Loan Program.

51. According to the May 21 Notice, once a PPP Lender successfully reported to SBA that a loan had been fully disbursed, the SBA paid the Lender.

52. Lenders were required to use SBA Form 1502 – "Guaranty Loan Status & Lender Remittance Form" - to report fully disbursed loans to SBA. Form 1502 required the Lender to certify the truth and accuracy of the financial details of the loan, including the amount, installment date, interest amount, and other data. This information, along with all the underlying loan details, had to be entered into the SBA Form 1502 spreadsheet and emailed to SBA servicing centers.

53. The May 21 Notice provided, "Lenders must make a one-time confirmation in the Lender's FTA Lender portal before SBA will disburse PPP processing fees to Lender." Specifically, Lenders were required to confirm the following:

> By checking the 'I confirm' box below, the Lender is agreeing that for each SBA Form 1502  submitted by Lender to request payment of Paycheck Protection Program (PPP) processing fees, Lender confirms (1) that all PPP loans included in the report were fully disbursed to the borrowers on the disbursement dates entered and in the loan amounts entered in the report; (2) Lender will make no further disbursements on the PPP loans included in the report; (3) ***all information in the report is true and correct***; and (4) the report has been submitted by an authorized employee or Agent of Lender acting within the scope of Lender's authority and ***Lender acknowledges responsibility for all entries and certifications made on its behalf.*** (emphasis supplied)

54. The SBA confirmed that the PPP Lender bears responsibility for all entries and certification made on a Lender's behalf by an Agent, such as Kabbage: "the Lender acknowledges that the Agent or LSP is acting within the scope of Lender authority and Lender acknowledges responsibility for all information submitted and entries and certifications made on its behalf."

## FACTS

### I. Kabbage's Participation in the PPP

55. Before the onset of the COVID-19 pandemic, Kabbage was struggling financially. Prior to its PPP work, Kabbage's had supplied services to approximately 225,000 businesses since its launch in 2009, according to media sources.

56. In March 2020, immediately prior to the passage of the PPP, the SBA announced it would provide aid to businesses affected by COVID-19 through its already-established Economic Injury Disaster Loan ("EIDL") program. EIDL loans were made available to small businesses and private, non-profit organizations in designated areas of a state or territory to help alleviate economic injury caused by the Coronavirus.

57. The SBA EIDL program is different than the traditional SBA 7(a) regime. Unlike the SBA's standard 7(a) program, where banks originate the credit for small-business loans, which are guaranteed by the administration, the SBA is the creditor for the EIDL program and private partners, including fintech companies like Kabbage, were prohibited from working on these EIDL loans.

58. Unable to provide EIDL loans, by March 20, 2020, a bankingdive.com article titled, "*Kabbage asks Congress to retool SBA's lending rules amid coronavirus crisis,*" reported that Kabbage was actively "lobbying the Trump administration, the U.S. Treasury, the National Economic Council and members of Congress, as well as the SBA, to allow the agency to use existing partners in its 7(a) structure to help onboard customers, automate underwriting and credit checks and feed that information digitally to the SBA for its disaster loan program."

14

59. This change would have directly and immediately benefitted Kabbage, since it originated its small business loans through its banking partner, Celtic Bank, which was already a partner in the SBA's 7(a) program. Had the EIDL change been approved, Kabbage would have been eligible to process loans on Celtic's behalf and earn lucrative fees as a result.

60. Kabbage was never approved to assist with COVID-19 related EIDL loans.

61. Although the March 27, 2020 passage of the CARES Act created the opportunity for service providers to facilitate loans for approved 7(a) Lenders as Agents, the opportunity did not, at that time, extend to Fintech firms like Kabbage.

62. On March 31, 2020, the U.S. Department of the Treasury released guidance on various aspects of the PPP, including guidance relevant to Lenders under the program. As detailed herein, that guidance explicitly provided that the PPP loans could be made only by existing section 7(a) SBA qualified Lenders, federally insured depository institutions, federally insured credit unions, and farm credit system institutions, but that loans could also be made by "Additional Lenders" that the Administrator and Secretary of the Treasury determined were qualified. Again, this definition excluded entities like Kabbage.

63. Without government approval to provide EIDL or PPP funds, on March 29, 2020, Kabbage paused its traditional small business loan lending services to all customers. On March 30, 2020 media sources reported that Kabbage furloughed "a significant number" of its 600 workers and closed one of its offices. Kabbage admitted at the time that the announcement would come as "a shock" to employees.

64. Days later, on April 3, 2020, despite being unapproved to process funds on behalf of SBA Lenders (nor approved to directly lend as an SBA Lender), Kabbage nonetheless began

15

encouraging customers to apply for PPP loans on its website, without disclosing to customers that it was not approved to do so.

65. As result of its successful lobbying efforts, Kabbage was finally approved as a service provider to process PPP funds as an Agent to SBA-approved Lenders on or around April 7, 2020.

66. On April 15, 2020, as detailed herein, the SBA's Interim Final Rule was published, allowing for non-bank and non-financial institutions like Kabbage to qualify as an SBA-approved PPP Lenders, and not merely Agents, upon the submission of an approved Form 3507.

67. Kabbage submitted Form 3507 and was approved as an SBA Lender no later than May 18, 2020.

68. As an SBA-approved Lender, Kabbage could lend to customers directly and could earn significantly higher PPP fees than it could as an Agent.

69. Ostensibly, without cash reserves to lend comparable to the funds allocated to the PPP or by the PPPLF, and without access to the Lender capital it accessed when working as an Agent, Kabbage took advantage of the PPPLF, with its CEO boasting in June 2020 *Forbes* article: "we are not aware of any other fintech that is accessing the liquidity lending facility."

70. According to Federal Reserve records, Kabbage borrowed at least $1.52 billion dollars from the PPPLF from April through August 2020. These funds were then used by Kabbage to provide PPP loans to Kabbage customers, and an equal amount of Kabbage's PPP loans served as collateral for the Federal Reserve.

71. Given its own financial situation and prospects as a going concern in early 2020, Kabbage now had significant incentive to process as many loan applications as possible, as quickly

as possible, for as much as possible. As both an Agent and Lender, Kabbage stood to earn hundreds of millions of dollars in fees (as it ultimately did) based on the volume of processed and submitted PPP loans.

72. Indeed, by the time the PPP closed on August 8, 2020, Kabbage announced that it had processed *$7 billion* in loans for nearly 300,000 *new* customers, more than doubling its customer base in less than 6 months. As it triumphantly announced in a press release, in the final week of the availability of the PPP funds alone, Kabbage processed 46,000 applications for almost $900 million in PPP loans. As a result, by the time the PPP expired in August of 2020, Kabbage was *the second largest PPP Lender in the United States* by application volume behind only JP Morgan – the largest bank, by assets, in the United States.

73. Between the time Kabbage was approved as a service provider and when it was approved as an SBA Lender in May 2020, it was reported in the Financial Times that Kabbage earned nearly $175 million in processing fees. Once Kabbage became an SBA Lender, based on the volume of loans it processed and provided, it was reported in the Miami Herald that Kabbage earned another $150 million in fees. All PPP processing fees were approved and paid by the Federal government based upon information and certifications made by Kabbage.

74. During the PPP lending period, Kabbage boasted in a press release that the median time from applying to approval for a PPP loan for its borrowers was a mere 4 hours and, more disconcerting, that over 75% of its approved applications were processed without human intervention or manual review.

75. Indeed, in the same document, Kabbage admitted that "prior to the PPP, Kabbage had never processed a loan for the SBA. In less than two weeks, Kabbage entirely restructured its lending platform and developed new automated systems to ingest, analyze, verify, and approve PPP applications . . ."

76. Kabbage's commitment to automation and technology and, by its own admission, its headlong rush to roll out a completely new platform to process PPP loans, resulted in the submission of tens of thousands of false claims for payment or approval, as detailed herein.

77. Kabbage's submission of false claims caused the SBA to approve payment of billions of PPP loans for borrowers, and hundreds of millions of PPP fees for Kabbage that were fraudulently inflated. Had the government known the truth, it would not have made the payments.

78. Kabbage's actions unfairly decreased the remaining pool of PPP money available to businesses affected by the COVID-19 pandemic.

79. Meanwhile, Kabbage took full advantage of its willingness to cut corners and ignore SBA rules and guidance to become the second-largest PPP Lender. No more than five months after furloughs and an office closure, and a mere ten days after the close of the PPP, Kabbage's enhanced reputation earned it a new, lofty $1 billion valuation, and American Express announced it was acquiring "key assets of" Kabbage on August 17, 2020.

## II.    Defendants' Fraudulent Scheme

80. In addition to the certification required by the May 21 Notice, several forms and certifications were required for borrowers and Lenders to access PPP funds. Collectively, these forms mandated that each Lender seek the appropriate information from borrowers and that the borrowers supply that information in a truthful manner.

18

81. Borrowers could not submit their information directly to the SBA. As such, it was reasonable for borrowers to rely on the accuracy and propriety of the information requested by Lenders such as Kabbage.

82. SBA Form 2483 is known as the "Paycheck Protection Program Borrower Application Form." Form 2483 was provided by Lenders to borrowers and required the borrower to provide the Lender with all the pertinent information needed for the Lender and the SBA to calculate the borrower's PPP loan. Borrowers had to certify that the information listed was correct and truthful.

83. In conjunction with every Borrower Loan Application Form 2483, Lenders also had to submit SBA Form 2484 – Lender's Application Paycheck Protection Program Loan Guaranty. Form 2484 required the Lender to attest to the size of the loan, certain details of how the loan was calculated, and to confirm that the borrower had certified to the Lender that it met the criteria of the PPP terms. Form 2484 also required that the Lender certify to the SBA that: "The Lender has complied with the applicable Lender obligations set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule . . ."

84. Section 3.b(i)-(iii) of the Paycheck Protection Program Rule (the SBA's April 15 IFR) required the Lender to, "confirm the dollar amount of the average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application."

85. Lenders could also replace Form 2483 with an on-line lending portal, as Kabbage did and as described below. The SBA allowed on-line portals if they sought the same certified information as Form 2483.

86. Under the terms of the PPP and as reflected on the Borrower Application Form 2483, the key metric for determining PPP loan size was the amount of each borrower's *monthly payroll costs*. This calculation determined how much the borrower could seek, regardless of the legal form of their business.

87. Under the PPP, qualifying small businesses could apply for SBA PPP loans for up to 2.5 times their average monthly payroll costs, subject to an overall cap of $10 million.

88. Using this monthly payroll cost figure, the SBA's April 15 IFR provided the formula for determining how much an employer could borrow:

a. "Step 1: Aggregate payroll costs (defined in detail below in f.) from the last twelve months for employees whose principal place of residence is the United States.

b. "Step 2: Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year.

c. Step 3: Calculate average monthly payroll costs (divide the amount from Step 2 by 12)

d. Step 4: Multiply the average monthly payroll costs from Step 3 by 2.5.

e. Step 5: Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID–19 loan (because it does not have to be repaid)."

89. Because of the importance of the monthly payroll costs, the SBA included in its April 15 IFR (and in subsequent interpretations) explicit guidance explaining which costs could and could not be included in an employer's calculation.

90. Lenders, like Kabbage, were therefore required to instruct borrowers to include only those monthly payroll costs specifically enumerated by the SBA.

91. According to the April 15 IFR, monthly payroll costs consist of "aggregate costs from the previous 12 months or from calendar year 2019 of any compensation to employees (whose principal place of residence is in the U.S.) in the form of:

   a. Salaries, wages, or commissions (capped at $100,000 per employee);

   b. Cash tips or the equivalent (calculated based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips);

   c. Payments for vacation, parental, family, medical, or sick leave;

   d. Allowance for separation or dismissal;

   e. Payments for the provision of employee benefits consisting of group health care coverage, including insurance premiums and retirement; and

   f. Payments of state and local taxes assessed on compensation of employees."

92. In order to make certain that Lenders understood the scope and purpose of the PPP, the SBA issued several rounds of guidance on what could be counted as "monthly payroll costs" and how each Lender should determine cost calculations for each kind of borrower (i.e. corporation, partnership, self-employed).

93. On June 26, 2020, the SBA published guidance entitled, "How to Calculate Maximum Loan Amounts - By Business Type" ("June 26 Guidance"). The June 26 Guidance outlined the cost data sources Lenders were to instruct borrowers to use to ensure appropriate maximum loan eligibility. This document provided the sources of information a Lender

21

should instruct each different type of borrower to use in determining its maximum loan eligibility.

94. Question 5 of the June 26 FAQ ("Frequently Asked Questions") Guidance asked, "How is the maximum PPP loan amount calculated for S corporations and C corporations (up to $10 million)?" In providing an answer, the SBA instructed that: "The following methodology should be used to calculate the maximum amount that can be borrowed for corporations, including S and C corporations.

Step 1: Compute 2019 payroll costs by adding the following:

- 2019 *gross wages and tips paid to your employees* whose principal place of residence is in the United States, which can be computed using 2019 IRS 941 Taxable Medicare wages & tips (line 5c-column 1) from each quarter plus any pre-tax employee contributions for health insurance or other fringe benefits excluded from Taxable Medicare wages & tips, subtracting any amounts paid to any individual employee in excess of $100,000 and any amounts paid to any employee whose principal place of residence is outside the U.S;

- 2019 employer health insurance contributions (portion of IRS Form 1120 line 24 or IRS Form 1120-S line 18 attributable to health insurance);

- 2019 employer retirement contributions (IRS Form 1120 line 23 or IRS Form 1120-S line 17); and

22

- 2019 *employer state and local taxes assessed on employee compensation, primarily state unemployment insurance tax (from state quarterly wage reporting forms).*" (emphasis supplied)

95. The same guidance was provided for all other business types. For someone self-employed with employees, "2019 gross wages and tips paid to your employees" and "2019 employer state and local taxes assessed on employee compensation" The guidance was the same for: partnerships ("2019 gross wages and tips paid to your employees" and "2019 employer state and local taxes assessed on employee compensation"); nonprofit institutions ("2019 gross wages and tips paid to your employees. " and "2019 employer state and local taxes assessed on employee compensation"); and nonprofit religious institutions ("2019 gross wages and tips paid to your employees" and "2019 employer state and local taxes assessed on employee compensation").

96. Thus, PPP Agents and Lenders knew, with specificity, all employer data needed for Form 2483 and the appropriate source of that information: "gross" wages and tips paid to employees, other employer-based contributions and costs, and state and local taxes assessed on employee compensation.

97. "Gross wages" are the full amount an employer pays an employee before taxes and other deductions are withheld. If an employee's salary is $5,000 per month, the employer pays her $5,000 per month in gross wages.

98. In addition to gross wages and employer health insurance and retirement contributions, the only other expenditure the SBA allowed in monthly payroll costs calculations were "employer state and local taxes assessed on employee compensation."

23

99. This meant that borrowers were also allowed to add whatever taxes they, *as employers*, were assessed by the state or locality on employee compensation. As the SBA's April 15 IFR and June 26 Guidance instructs, these types of employer state and local taxes assessed on employee compensation are generally state unemployment tax assessments.

100. Every state in the country requires employers to pay payroll taxes based on employee compensation to help fund state unemployment programs. In Massachusetts, for example, the state and local taxes "assessed on employee compensation" are paid solely by the employer. Unlike withholding taxes, unemployment taxes do not come out of the employee's paycheck because they are not assessed on or paid by the employee (in certain other states, employees also contribute.)

101. The Department of Unemployment Assistance ("DUA") assesses Massachusetts employers a tax on the first $15,000 of employee wages of every employer covered under the Unemployment Insurance Law (G.L. c. 151A, § 14(a).) The tax rate is also based in part on the employer's experience rating, which is the calculation of an employer's average number of employees whose employment ended during the past 3 years who subsequently received unemployment insurance. The employer's tax rate is also based in part on the statutory rate schedule in effect for Massachusetts employers.

102. Massachusetts employers are also assessed state taxes on employee compensation for health insurance for unemployment insurance claimants (.12% of the first $15,000 of an employee's wages) and for workforce development (.06% of the first $15,000 of an employee's wages).

103. The unemployment tax amounts are miniscule compared to state income tax. The Massachusetts income tax rate, for example, is a flat 5.05% on gross wages. Generally, the

rate in states with income taxes range from 1.0% to 13.3% with higher percentages applying to higher income brackets.

104. Collectively, these are the taxes "assessed by the state or locality on employee compensation" paid solely by the employer in Massachusetts that were enumerated for inclusion in an employer's calculation of its monthly payroll costs.

105. The inclusion of these types of taxes furthers the PPP's goal of keeping employers and their businesses running, as employers were still obligated to pay state taxes during the COVID-19 pandemic. This same reason explains why employers could include what they paid in employee health insurance and retirement contributions, as they were *costs* actually incurred by the *employer*.

106. Thus, Agents and Lenders who properly complied with the terms of the PPP and followed the SBA guidance should have instructed borrowers to include the amount of these state and local taxes assessed on compensation in their applicable portals and forms, and were required to ask the borrower for supporting documentation.

107. Nowhere in the text of the PPP or any SBA guidance or, however, are Lenders allowed to instruct borrowers to add *state and local income tax withheld* to an employer's calculation of monthly payroll costs.

108. State and local income withholding taxes are fundamentally different from state and local taxes assessed on compensation of employees. Withholding taxes based on income are taxable to *employees'* gross wages. While as a matter of convention they are generally withheld from an employee's paycheck by the employer and then remitted by the employer to the state on the employee's behalf, it is axiomatic that the employer does not "pay" the employee's state and local income tax.

25

109. Employee income taxes withheld by an employer are not employer payroll costs. Because employees, not employers, pay state and federal income tax on employee income, an employer's total payroll costs do not include the amount of income tax an employee had withheld. Thus, the SBA never allowed employers to add what employees paid in income tax to the employer's monthly payroll costs.

110. In fact, under paragraph 3(g) of the April 15 IFR, the SBA explicitly disallowed federal income tax withholdings from payroll costs. Paragraph g states: "Is there anything that is expressly excluded from the definition of payroll costs? Yes. The Act expressly excludes the following: (iii) Federal employment taxes imposed or withheld between February 15, 2020 and June 30, 2020, including the employee's and employer's share of FICA (Federal Insurance Contributions Act) and Railroad Retirement Act taxes, and income taxes required to be withheld from employees."

111. The SBA also provided detailed guidance on this parallel issue of whether Federal income tax withholdings could be counted as payroll costs and were again unequivocal in their position that they could not. In its June 25, 2020 FAQ's, the SBA included Question 16, which asked: "How should a borrower account for federal taxes when determining its payroll costs. . ."? The SBA stated that:

> Payroll costs are calculated on a ***gross*** basis ***without regard to federal taxes imposed or withheld***, such as the employee's and employer's share of Federal Insurance Contributions Act (FICA) and federal income taxes required to be withheld from employees . . .

> [T]he SBA interprets this statutory exclusion to mean that ***payroll costs are calculated on a gross basis***, without subtracting federal taxes that are imposed on the employee or withheld from employee wages.

112. The SBA even provided a clarifying example: "*[A]n employee who earned $4,000 per month in gross wages, from which $500 in federal taxes was withheld, would **count as***

26

***$4,000 in payroll costs***. *The employee would receive $3,500, and $500 would be paid to the federal government."* Congress's intent was plain: gross salary meant salary before tax withholdings.

113. Wantonly ignoring the plain language of the PPP statute and all available guidance, Kabbage *added* the state equivalent of the hypothetical state income taxes to the already "gross" income number. Because gross wages are without deductions, adding state withholding tax to the gross wage amount results in a calculation that is more than 100% of gross wages.

114. For example, on gross wages of $5,000 and a state income tax of 5%, Kabbage's methodology, when so applied, results in the submission of "gross wages," of $5250, or 105% of the true gross wages total.

115. Kabbage violated the PPP and, further, did not follow explicit SBA guidance with respect to the calculation of average monthly payroll costs. Kabbage's deliberate, willful, and knowing actions are without any support.

116. By adding the amount of state and local income taxes withheld by an employer on an employee's behalf ***to*** a gross wages calculation, Kabbage fraudulently inflated employers' costs, increasing the amount of their PPP loans and increasing the amount of Kabbage's dependent PPP fee.

117. By instructing borrowers to submit incorrect information on loan applications to the SBA as a Lender, Kabbage knowingly presented and caused to be presented to the SBA false or fraudulent claims for payment or approval of PPP loans.

118. In addition, while acting as a PPP Agent, Kabbage knowingly caused the many banks and financial institutions for whom it served as an Agent to present to the SBA false claims for

27

payment and approval, to the extent they submitted PPP loan applications based upon Kabbage's fraudulently inflated gross wage calculations.

119. These banks and financial institutions (the DOES alleged herein) also had an independent responsibility to ensure the accuracy of the information Kabbage was collecting on their behalf as an Agent. In order to receive their own Lender processing fees from the SBA pursuant to the May 21 Notice, each Lender had to attest in Form 1502 that, "the Lender acknowledges that the Agent or LSP is acting within the scope of Lender authority and Lender acknowledges responsibility for all information submitted and entries and certifications made on its behalf."

120. Thus, all PPP fee applications based on Kabbage's fraudulently inflated gross wage calculations, whether submitted by Kabbage as a Lender, or by another Lender where Kabbage was acting as an Agent, were false claims for payment and approval in violation of the False Claims Act.

### III.    Kabbage's PPP Portal

121. Kabbage's online PPP application portal ("Portal") repeats the fraudulent implementation of the PPP as described above

122. While the SBA allowed Lenders like Kabbage to create their own websites for inputting borrower information, such online portals had to include the same information as the Borrower Application Form 2483.

123. In contravention of the SBA rules, Kabbage created a non-compliant portal that required borrowers to enter information that Kabbage knew to be excluded from the calculation of payroll costs: state and local income withholding taxes. By its design, Kabbage's Portal

fraudulently inflated the amount of PPP loans sought and approved by the Federal government.

124. Relator personally used Kabbage's Portal on behalf of his clients who sought, and were approved for, PPP loans whose amounts were based on fraudulently inflated gross income calculations. Relator used the Kabbage Portal to successfully submit PPP loan information on behalf of two Massachusetts-based borrowers.

125. Kabbage's Portal first asked a prospective borrower for their business name, legal name, and then their company structure, which, as Kabbage noted "will determine the tax documents you need to upload." A borrower could then choose from sole proprietorship, general partnership, corporation, or LLC.

126. Relator entered the appropriate information on behalf of a Massachusetts-based S-corporation client ("Client 1").

127. Kabbage's Portal next asked whether, pursuant to the PPP, the borrower was a 501(c)(3) nonprofit, 501(c)19) veteran's organizations, tribal business, or eligible self-employed, as those categories required potentially different forms.

128. Relator, on behalf of Client 1, entered "none of the above."

129. Kabbage's Portal then prompted for Client 1's Tax ID number and their 6-digit NAICS code, which Relator entered.

130. After including these, the Kabbage Portal asked whether Client 1 was a franchise listed in the SBA's Franchise Directory, and when the applicant started its business.

131. Relator, on behalf of Client 1, selected "no" and the appropriate date.

132. Depending on the type of corporate structure the borrower initially selected, Kabbage next asked for information input provided in certain federal tax documents.

29

133. If the applicant was an LLC or S-corporation, the Kabbage Portal asked if they had filed a Form W-3 for "yourself or your employees in 2019?"

134. Relator, on behalf of Client 1, selected "yes."

135. Form W-3s are Transmittals of Wage and Tax Statements that accompany and summarize the data in Form W-2.

136. Form W-3 shows the IRS the total amount an employer paid to all its employees, as well as the total federal and state income, Social Security, and Medicare taxes the employer withheld from its employees. It also provides the IRS the number of employees and the number of W-2 Forms included in the employer's filing.

137. When Relator responded "yes" to whether Client 1 had filed W-3s, the Kabbage Portal required additional information. In the first field on its Portal, Kabbage required the borrower to "enter the value in box 1 of your 2019 Form W-3."

138. Box 1 of Form W-3 is the gross total wages, tips, commissions, and other compensation.

139. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to input this information into an employer's monthly payroll costs.

140. Relator, on behalf of Client 1 and following the Kabbage Portal's instructions, input the appropriate amount -- the amount from box 1 of Client 1's 2019 Form W-3 -- into this first field.

141. The Kabbage Portal next required the borrower to input the value in box 5 of the 2019 W-3. Box 5 of Form W-3 is "Medicare Wages and Tips."

142. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to input this information into an employer's monthly payroll costs.

The information in Box 5 is often the same as the information in Box 1. The higher of the two is used in determining the gross payroll costs.

143. Relator, on behalf of Client 1 and following the Kabbage Portal's instructions, input the amount from box 5 of the Client 1's 2019 Form W-3 -- into this second field.

144. Finally, the Kabbage Portal instructed the borrower to "add the values in boxes 17 and 19 of your 2019 Form W-3," noting under the blank field that these were the "total state and local income tax paid in 2019."

145. Boxes 17 and 19 of Form W-3 are in fact "state income tax" and "local income tax," respectively, and represent the total amount in state and local income tax that the employer *__withheld__* from its employees.

146. Relator, on behalf of Client 1 and following the Kabbage Portal's instructions, input the added values of lines 17 and 19 of Client 1's 2019 Form W-3 -- into this third field.

147. As described herein, Kabbage's and the Kabbage Portal's instruction to borrowers to include state and local income tax withholdings as part of the payroll cost calculation violated the PPP and FCA.

148. Next, the Kabbage Portal required borrowers to answer questions regarding Client 1's remaining monthly payroll cost criteria.

149. The Kabbage Portal asked whether in 2019, the borrower filed an IRS Form 940 detailing either of the following: vacation, parental, family, medical or sick leave; and severance, as allowance for dismissal.

150. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to input this information into an employer's monthly payroll costs.

151. Relator, on behalf of Client 1, selected "no."

31

152. The next page of Kabbage's Portal asked whether a borrower wanted to "include employer-sponsored healthcare benefits in your average monthly payroll calculation?"

153. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to input this information—if they so chose—into an employer's monthly payroll costs.

154. Relator, on behalf of Client 1, selected "no" as Client 1 had no such payroll costs.

155. The Kabbage Portal next asked whether a borrower had "U.S.-based employees whose combined 2019 wages, tips, and other cash compensations exceeded $100,000?"

156. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to answer this question because it was directly relevant in the calculation of an employer's monthly payroll costs, as per-employee compensation greater than $100,000 was excluded from the gross payroll cost calculation.

157. Relator, on behalf of Client 1, selected "no."

158. Next, the following Kabbage Portal field asked, "Is the United States the principal place of residence for all employees of the Applicant included in the Applicant's payroll calculation?"

159. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to answer this question as salary for employees residing outside of the United States was excluded from the gross payroll cost calculation.

160. Relator, on behalf of Client 1, selected "yes."

161. Kabbage next asked whether the "Applicant received an SBA Economic Injury Disaster Loan between January 31, 2020 and April 3, 2020?"

32

162. Under the terms of PPP and the official SBA guidance, the Kabbage Portal correctly instructed borrowers to answer this question, as these loans were relevant to the calculation of the gross payroll cost calculation

163. Relator, on behalf of Client 1, selected "no."

164. The Kabbage Portal then presented Client 1 with a loan eligibility figure based on an "average monthly payroll calculation." This calculation was done by adding Client 1's gross wages (box 1) and (erroneously) Client 1's state and local income tax withholdings (boxes 17 and 19), which resulted in an annual payroll cost figure of $72,843. Kabbage then divided this annual cost figure by 12 to get $6,070.00, Client 1's average monthly payroll calculation. This amount included the state and local income tax withholdings on top of gross wages.

165. The Kabbage Portal reported that Client 1 was eligible for a PPP loan that had been based on fraudulently inflated payroll calculations that had included the amount of state and local income tax withheld on top of gross wages. The loan amount directly correlated to the amount of payroll costs inflated by Kabbage.

166. Kabbage further compounded the fraud by multiplying Client 1's inflated monthly payroll cost figure by 2.5 (the figure provided for in the April 15 IFR) to inaccurately determine that Client 1 was eligible for a loan of $15,175.00 - 2.5 times the original inflated gross income amount.

167. On June 23, 2020, Client 1 was in fact issued a PPP loan in the amount of $15,175.00.

168. Kabbage applied for and received PPP fees based on Client 1's loan. Those fees were based directly on the inflated amount of $15,175.00.

169. Relator worked with a second client, "Client 2," who also submitted PPP loan application forms through Kabbage using Kabbage's Portal.

170. The Kabbage Portal sought the same data for Client 2 as it did for Client 1. Specifically, the Portal also required Client 2 to add state and local income tax withholding amounts (boxes 17 and 19) to Client 2's gross wage data (box 1).

171. The Kabbage Portal then presented Client 2 with a loan eligibility figure based on an "average monthly payroll calculation." Client 1's average monthly payroll calculation, an amount that included the state and local income tax withholdings, was $16,848.40.

172. The Kabbage Portal reported that Client 2 was eligible for a PPP loan that had been based on fraudulent payroll calculations that had included the amount of state and local income tax withheld on top of gross wages. The loan amount directly correlated to the amount of payroll costs inflated by Kabbage.

173. As with Client 1, Kabbage then further compounded the fraud by multiplying Client 2's inflated monthly payroll cost figure by 2.5 (the figure provided for in the April 15 IFR) to inaccurately determine that Client 1 was eligible for a loan of $42,121.00 - 2.5 times the original inflated gross wages amount.

174. On July 30, 2020, Client 2 was in fact issued a PPP loan in the amount of $42,121.00.

175. Kabbage applied for and received PPP fees based on Client 2's loan. Those fees were based directly on the inflated amount of $42,121.00.

176. Upon information and belief, Kabbage's Portal calculated all PPP loans using the same methodology, and thus included state and local withholding tax amounts on top of gross wages to the calculation of average monthly payroll. Kabbage then submitted, and caused

34

to be submitted, the SBA PPP loan applications to the government for payment and approval.

177. As a result, each loan application containing the inflated monthly payroll cost figure which Kabbage presented or caused to be presented to the SBA for approval was a false claim, submitted in violation of the False Claims Act.

178. Further, each claim Kabbage submitted for PPP Agent or Lender fees arising from the inflated loans described herein was a separate false claim, submitted in violation of the False Claims Act.

179. Throughout the PPP process, PPP borrowers were required to use an SBA-approved Lender, or approved processing Agent to apply for their PPP loan. Under these circumstances, borrowers had no reason to question whether the information sought and submitted by Kabbage was appropriate or proper. Their only obligation was to ensure the requested data was accurate. PPP borrowers had no reason to suspect or believe that the information Kabbage was requiring them to include into the calculation of monthly payroll costs would result in the submission of false claims to the government.

180. Kabbage's Portal was additionally defective because it did not allow borrowers to include the amount of assessed state and local unemployment tax payments (separate from state income tax withholdings), even though these costs were authorized under the April 15 IFR and other official SBA guidance.

181. Specifically, after Kabbage's Portal asked borrowers for their W-3 figures, Kabbage ignored the state and local unemployment assessments. In excluding the unemployment assessments, however, Kabbage noted that "To speed up application processing time, Kabbage is not currently including state and local unemployment taxes in the calculation

35

of your expected loan amount. This may result in a slightly lower loan amount but allows us to submit your application faster."

182. These additional, legitimate monthly payroll costs would have provided more funds to borrowers—all of whom would have benefited from every dollar made available to them—but would have required Kabbage to spend extra time reviewing documentation. As noted herein, unemployment assessments were generally far less compared to the amount of state tax assessments, and their omission would not offset the fraudulent addition of state tax withholdings in the calculation of average monthly payroll costs.

183. Regardless, the blanket exclusion of the unemployment assessments from monthly payroll costs shows that Kabbage was willing to shortchange both its customers and the Federal Government at the same time.

IV.    **Kabbage's Use of Government PPPLF Funds**

184. The Federal Reserve Banks are instrumentalities of the Federal Government and the operating arms of its central bank. The Federal Reserve Act empowers the Federal Reserve Banks to issue legal tender and to finance the Federal Reserve's activities by purchasing public and private debts. The Federal Reserve Act also authorizes the Federal Reserve Banks to administer emergency lending facilities. The PPPLF is such a facility, as it was created pursuant to the Federal Reserve Bank's emergency authority under Section 13(3) of the Federal Reserve Act, under which Congress granted the Federal Reserve Banks the ability to extend emergency credit.

185. In establishing the PPPLF, the Federal Reserve Banks act as agents of the United States because the United States created the Federal Reserve Banks to act on its behalf to extend emergency credit to eligible institutions; the Federal Reserve Banks in fact extended such

36

emergency credit to those institutions (such as Kabbage); and the Federal Reserve Banks did so in compliance with the rules enacted by Congress.

186. The PPPLF became operational on April 16, 2020 for traditional bank depository institutions to access. On April 30, 2020, the Federal Reserve expanded access to the PPPLF to non-depository institutions, such as Kabbage.

187. The PPPLF provided Kabbage access to the Federal Reserve's Discount Window, a standing facility though which the Federal Reserve makes short-term loans to eligible institutions. Lenders such as Kabbage could access the PPPLF for amounts up to the principal amounts of aggregate PPP loan collateral pledged in return to the Federal Reserve.

188. In order to access the Discount Window under the PPPLF, Kabbage was required to submit a "Paycheck Protection Program Liquidity Facility Letter of Agreement (Non-Depository Institutions)" ("PPPLF Agreement"). The PPPLF Agreement outlined the terms under which the PPPLF would advance Kabbage the loan amounts it requested by requiring Kabbage to confirm and certify the value of the PPP loan amounts it was required to pledge as collateral. In order to receive the loan amounts it applied for, Kabbage had to "warrant[], represent[] and covenant[] that each such Item pledged as collateral for Advances under the Facility:

    a. Is a "covered 7(a) loan" under the terms of the PPP;

    b. ***Complies with all requirements of the PPP, including without limitation any rules or guidance issued by the SBA implementing the PPP, and any requirements set forth in any agreement the Borrower is required to execute by the SBA in connection with the PPP;***

    c. Has been duly approved under delegated authority for guaranty by the SBA;

d. Satisfies applicable Collateral requirements in the Circular; and

e. Was either (1) originated by us or (2) purchased by us in accordance with the SBA's requirements for the sale and purchase of whole PPP Loans (in either case, such that we are the beneficiary of the SBA's guarantee of such PPP Loans)."

(emphasis supplied).

189. The PPPLF Agreement further confirmed that the "PPPLF Collateral valuation for each Item shall equal the principal amount of the PPP Loan outstanding at the time the PPP Loan is pledged as PPPLF Collateral."

190. Once it was authorized to access the Discount Window, Kabbage could apply for and borrow only as much as the value of the PPP loans it could pledge as collateral. To accomplish this, Kabbage was required to submit a "Transmittal Form for Pledge of Small Business Administration Paycheck Protection Program Loans (SBA PPP) for the Paycheck Protection Program Liquidity Facility (PPPLF) and Request for PPPLF Advance PPPLF-- Non-Depository Institution" ("Transmittal Form").

191. The Transmittal Form required Kabbage to list the principal amount of each PPP loan it was pledging to the Federal Reserve and in doing so, to certify that Kabbage was "pledging the SBA PPP pool below as collateral to secure an advance that the Borrower hereby requests be made pursuant to the PPPLF under the terms and conditions of the PPPLF Letter of Agreement."

192. Consistent with the terms described above, Kabbage applied for and received loans in the amount of $1.52 billion from the PPPLF by submitting Transmittal Forms containing information about the value of Kabbage's PPP loans. The Federal Reserve only approved and funded Kabbage's loan requests because of the value of the pledged collateral.

38

Kabbage could only pledge collateral based on the principal amount of the PPP loans it originated.

193. The PPP loans Kabbage approved were based on Kabbage's false and inflated monthly payroll cost calculations, which caused borrowers to receive false and inflated PPP loan amounts. As a result, the principal amount of every PPP loan obtained through Kabbage's fraud was also false and caused the Federal Reserve to advance money from the PPPLF to Kabbage based on these false and inflated loan values.

194. Kabbage therefore violated the False Claims Act when it requested loans from the PPPLF based on the false and inflated PPP loan amounts it pledged as collateral.

195. Kabbage also violated the False Claims Act when it used the $1.52 billion it received from the PPPLF to directly fund the false and fraudulent PPP Borrower Loan Applications, as alleged herein.

## V.    Loan Forgiveness

196. As critical as PPP loans were for businesses trying to keep their staff and to stay open, the prospect of full loan forgiveness was even more important. The PPP provides that loans can be fully forgiven if certain criteria are met, including verification by the lender and borrower that a specific percentage of the PPP loan was used for "payroll costs." These "payroll costs" are substantially similar to the "payroll costs" needed to determine the amount of a PPP loan in the first instance -- gross wages and tips paid to employees and employer state and local taxes assessed on employee compensation -- that Kabbage systematically and falsely overinflated, as alleged herein.

197. Broadly, the enumerated requirements for loan forgiveness are: that a small business use at least 60% of the PPP loan on eligible "payroll costs" during the 24 week period beginning

on the day the PPP loan was disbursed; that the remaining 40% of the PPP loan be only used for utilities, mortgage interest, and rent; that the small business not reduce employee wages by more than 25%; and that the business not reduce the number or hours of its employees (unless an employee refused to be rehired for the same wages and hours).

198. According to the SBA's procedural guidance, Lenders are responsible for collecting information from borrowers regarding loan forgiveness eligibility and transmitting that information to the SBA for approval. If a borrower's request for loan forgiveness is approved, the SBA reimburses the Lender for the full amount of the PPP loan the Lender disbursed.

199. Lenders, like Kabbage, were therefore incentivized to ensure that each borrower's use of PPP loan funds met the forgiveness criteria, so the Lender's capital outlay to the borrower would be reimbursed in full by the government.

200. To qualify for PPP loan forgiveness, a borrower must complete and submit SBA Form 3508 – PPP Loan Forgiveness Calculation Form (or 3508EZ or 3508S) to the lender. Forms 3508, 3508EZ, and 3508S require the borrower to enter all information regarding the borrower's use of the PPP loan money during the applicable time period. Documentation in support of these calculations must also be attached.

201. According to the SBA's July 23, 2020 Procedural Notice ("July 23 Notice"), a "PPP Loan Program Requirement" pursuant to 13 CFR § 120.10, the PPP Lender of record must review the Loan Forgiveness Calculation Form confirm the borrower's loan forgiveness calculations. Further, the Lender must "confirm[] receipt of the borrower certifications in the SBA Form 3508 form" and "confirm[] receipt of the documentation the borrower must submit to aid in *__verifying payroll and nonpayroll costs.__*"

40

202. The July 23 Notice states that "Lenders are expected to perform a good-faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning amounts eligible for forgiveness." Thereafter, the Lender must complete the review of the Loan Forgiveness Application and issue a decision regarding forgiveness eligibility to SBA, along with the required documents. Subject to any SBA review of the loan or loan application, the SBA will then remit the appropriate forgiveness amount to the Lender.

203. The SBA also created a secure PPP Forgiveness Platform ("Platform") to accept loan forgiveness decisions, supporting documentation, and requests for forgiveness payments. The Platform is available only to PPP Lenders and not to PPP borrowers.

204. The Platform "makes available a user interface for lenders to upload required data and documentation, monitor the status of the forgiveness request, and respond to SBA in case of an inquiry or if SBA selects the loan for review." In using the Platform, the SBA requires that "lenders must confirm the following for each PPP forgiveness submission before SBA will accept the submission:

    a. this submission accurately reflects the Lender's decision regarding the borrower's loan forgiveness application;

    b. the information provided by the Lender to SBA with this submission accurately reflects the Lender's records for the PPP loan;

    c. c. the Lender has made its decision in accordance with the requirements set forth in Part III.2.a. of the PPP Interim Final Rule on SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, as amended . . ."

205. As with non-Platform forgiveness applications, in order for the loan to be forgiven and for Kabbage to receive reimbursement, Kabbage must submit the above documentation

41

through the Platform attesting that the borrower supplied the correct information about how the PPP loan was used. Again, Kabbage is also required to "perform a good-faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning amounts eligible for forgiveness," including the amount of, and whether the loan was used for, "monthly payroll costs."

206. Because Kabbage's Loan Forgiveness applications rely on the same inflated data and calculations as the PPP loan applications, Kabbage's submission of Borrower Loan Applications are also false claims.

207. Certifications to the contrary notwithstanding, it is impossible for Kabbage to perform a meaningful "good faith review" of or otherwise certify the accuracy of loan figures that were fraudulently inflated when Kabbage was the cause of the falsity.

208. As such, Kabbage violated the False Claims Act when it submitted fraudulently inflated Loan Forgiveness applications to the SBA for payment and approval.

## HOW KABBAGE DEFRAUDED THE GOVERNMENT

209. As detailed herein, Kabbage and DOES defrauded the United States in conjunction with: their requests for processing fees; their submission of PPP Borrower Loan Applications; their submission of Loan Forgiveness Applications; and their requests for loans from the PPPLF.

210. The SBA would only pay Kabbage its processing fees if Kabbage submitted a Form 1502, which required Kabbage to confirm that "_all_ the information," including the _loan size_ in each Form 1502 was "true and correct." Because Kabbage knew (and caused) the dollar amount of the average monthly payroll costs to be inflated, any borrower's information and loan size that was so inflated was untrue and incorrect.

211. Thus, each and every Form 1502 submitted by Kabbage containing loan amounts that were inflated by its scheme as alleged herein were false claims for payment of processing fees by the SBA.

212. As a result of the submission of these false claims, the SBA paid Kabbage hundreds of millions of dollars in processing fees to which it was not entitled.

213. In addition, Kabbage knowingly caused any Lenders (including DOES) for whom it served as an Agent and to present to the SBA false claims for payment and approval, when those Lenders submitted a Form 1502 based upon Kabbage's fraudulently inflated gross wage calculations and resulting loan size figure.

214. Kabbage further defrauded the government in its submission of PPP Borrower Loan Applications (Form 2483). PPP Borrower Loan Applications that included the amount of state and local income taxes borrowers withheld on top of gross wages in the calculation of monthly payroll costs were false on their face. Because gross wages are already without deductions, adding state withholding tax to the gross wage amount results in a calculation that is more than 100% of gross wages. By adding income taxes *to* a calculation of gross wages, Kabbage fraudulently inflated each employer's payroll costs, which fraudulently increased the amount of their PPP loan received by the borrowers.

215. In addition, while acting as a PPP Agent, Kabbage knowingly caused Lenders for whom it served as an Agent (the DOES) to present to the SBA false claims for payment and approval, to the extent they submitted PPP Borrower Loan Applications based upon Kabbage's fraudulently inflated gross wage calculations.

216. Kabbage directly funded at least $1.52 billion worth of PPP loans for borrowers using loans Kabbage obtained from the Federal Reserve's emergency lending facility, the PPPLF.

43

217. As such, each and every PPP Borrower Loan Application Kabbage submitted which contained inflated monthly payroll costs -- and which was approved and funded with PPPLF money borrowed by Kabbage -- was a false claim for payment or approval.

218. Kabbage's banking partners (the DOES) -- for whom Kabbage served as both Agent and worked in conjunction with as a Lender -- also borrowed billions of dollars from the PPPLF that were used to pay the fraudulent loan applications Kabbage submitted to the SBA. As such, each and every loan application Kabbage submitted on behalf of borrowers that contained inflated monthly payroll costs, and which were approved and funded with PPPLF money borrowed by DOES, were false claims for payment or approval.

219. Kabbage submitted other false and fraudulent documentation in conjunction with its PPP Borrower Loan Applications. Kabbage submitted forms to the SBA with its PPP Borrower Loan Applications expressly certifying that Kabbage complied with all the requirements of the PPP and other federal statutes when it knew it had not.

220. Because it was a non-bank institution seeking to become a Lender, Kabbage was required to sign Form 3507, attesting that it would: "assume all obligations, responsibilities, and requirements associated with delegated processing of covered loans made under the Paycheck Protection Program;" that it was "responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan;" and that it would, "certif[y] that it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements."

221. Form 3507 also required Kabbage to acknowledge that "any false statements made to the U.S. Small Business Administration and Department of the Treasury can result in criminal

44

prosecution under 18 U.S.C. 1001, 15 U.S.C. 645, and other provisions and imposition of civil money penalties under 31 U.S.C. 3729."

222. Kabbage's Form 3507 certifications were false because Kabbage added state income withholding taxes in monthly payroll cost calculations on top of gross wages, thereby significantly inflating the PPP loan amounts for its borrowers. Despite its certifications to the contrary, Kabbage failed to "assume the obligations, responsibilities, and requirements" of a Lender under the PPP because adding state and local income withholding taxes on top of gross wages was not allowed. For the same reasons, Kabbage's Form 3507 was false because it could not truthfully "certif[y] that it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements." Kabbage's Form 3507 certifications were also false because it falsely certified it would "maintain compliance" with the May 21 Notice (a PPP Loan Program Requirement) regarding submission of accurate Form 1502 requests for processing fees.

223. Kabbage's Form 2484 certifications, which were required to be submitted in conjunction with every single Borrower Loan Application (Form 2483), were also false. Form 2484 required Kabbage to expressly certify that it had "complie[d] with the applicable Lender obligations set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule . . ." Section 3.b(i)-(iii) required the Lender to "confirm the dollar amount of the average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application."

224. Kabbage's Form 2484 certifications that included state income withholding taxes in monthly payroll cost calculations—thereby inflating the PPP loan amounts for its

45

borrowers—were false. Because of this, Kabbage was unable to, pursuant to section 3.b(i)-(iii) of the Paycheck Protection Program Rule (the April 15 IFR) "confirm the dollar amount of the average monthly payroll costs" because it had already knowingly caused those amounts to be false.

225. Kabbage defrauded and will continue to defraud the United States because of its Loan Forgiveness Applications. Kabbage's false PPP Borrower Loan Applications caused, and will continue to cause, the SBA to reimburse Kabbage each time borrowers seek forgiveness of their PPP loans.

226. In order for each PPP loan to be forgiven and for the government to reimburse Kabbage the amount of the forgiven PPP loan, Kabbage must submit a Loan Forgiveness Application to the SBA, which includes verification of, and documentation that, the borrower supplied the correct information about how they used the PPP loan, including for monthly payroll costs.

227. Because Kabbage's Loan Forgiveness Applications rely on the same inflated data and calculations for monthly payroll costs as the PPP Borrower Loan Applications, Kabbage's submission of Loan Forgiveness Applications for reimbursement, and the SBA's resulting payments to Kabbage, will make the underlying PPP Borrower Loan Applications false claims, and are themselves false claims presented to the SBA for payment and approval.

228. Kabbage also defrauded the United States when it requested and received loans from the PPPLF. Kabbage's requests for PPPLF loans were false claims because the principal PPP loan amounts it pledged as collateral were based on fraudulently inflated PPP loan values -- a result of Kabbage fraudulently calculating the borrower's monthly payroll costs, as alleged herein.

229. Each Transmittal Form Kabbage submitted to the Federal Reserve containing inflated PPP loan values was a false claim presented to the United States for payment and approval.

230. Kabbage further defrauded the United States when it submitted PPPLF documents to the Federal Reserve Banks in conjunction with its PPPLF Transmittal Forms in which it expressly certified it was in compliance with the terms of the PPP and official SBA guidance when it knew it was not.

231. In order to access the PPPLF in the first instance, Kabbage had to agree to the terms set forth by the Federal Reserve through the PPPLF Agreement. This document required Kabbage to certify that in pledging the collateral used as the basis for the size of the loan from the Federal Reserve, Kabbage would "*Compl[y] with all requirements of the PPP, including without limitation any rules or guidance issued by the SBA implementing the PPP, and any requirements set forth in any agreement the Borrower is required to execute by the SBA in connection with the PPP.*"

232. By fraudulently inflating borrowers' monthly payroll costs as the basis for the size of a PPP loan, Kabbage did not comply with the requirements of the PPP, or the guidance of the SBA. As such, Kabbage's express certifications to the contrary were false.

## FIRST CAUSE OF ACTION

**False Claims Act: 31 U.S.C. §3729(a)(1)(A): Presenting and Causing False Claims**

233. Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

234. As alleged herein, Defendant Kabbage violated the False Claims Act when it presented and caused to be presented materially false and fraudulent claims for payment or approval to the United States Small Business Administration in the form of fraudulent PPP Borrower

47

Loan Applications, PPP Loan Forgiveness Applications, Form 1502 claims for processing fees, Form 3507 certifications, and Form 2484 certifications.

235. Kabbage additionally caused the DOES to present or cause to be presented materially false and fraudulent claims for payment or approval to the United States Small Business Administration in the form of the DOES' PPP Borrower Loan Applications, PPP Loan Forgiveness Applications, Form 1502 claims for processing fees, and Form 2484 certifications.

236. Kabbage and the DOES presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

237. The United States sustained damages because of Defendants' wrongful conduct and submission of false claims.

238. Kabbage also violated the False Claims Act when it presented and caused to be presented materially false and fraudulent claims for payment or approval to the Federal Reserve Banks in the form of fraudulent loan applications to the PPPLF.

239. The fraudulently inflated loan applications were presented by Kabbage to the Federal Reserve Banks by way of Transmittal Forms, in which Kabbage falsely stated the values of its PPP loans in pledging them as collateral.

240. The United States, through its agents the Federal Reserve Banks, loaned Kabbage more money than it was entitled to because of Kabbage's fraud. The money Kabbage received by the Federal Reserve was money made available and supplied by the United States.

241. Kabbage presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

48

242. The United States sustained damages because of Defendants' wrongful conduct and submission of false claims.

## SECOND CAUSE OF ACTION

### False Claims Act: 31 U.S.C. §3729(a)(1)(B): False Statements Material to False Claims

243. Relator incorporates by reference all paragraphs to this complaint set out above as if fully set forth here.

244. Kabbage made, used, caused to be used false records or statements to get false or fraudulent claims paid and approved by the SBA, and that were material to the SBA's payment of the false claims at issue in this case.

245. Kabbage made false certifications and representations when submitting false claims for payment. Kabbage's false certifications of compliance in its Form 3507 caused the SBA to approve its initial participation in the PPP, which allowed Kabbage to present all of the false claims, as alleged herein.

246. Kabbage's false representations and certifications in each one of its fraudulently inflated Form 2484 submissions, as alleged herein, caused the SBA to pay and approve Kabbage's false PPP Borrower Loan Applications, which also later caused, and will continue to cause, the SBA to forgive those loans and reimburse Kabbage based on Kabbage's false Loan Forgiveness Applications presented to the SBA for payment.

247. Kabbage's false representations and certifications in each one of its Form 2484 submissions, as alleged herein, also caused the SBA to pay and approve Kabbage's false Form 1502 claims for processing fees.

248. The express false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

249. Defendants made or caused to be made such false records or statement with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

250. The United States sustained damages because of Defendants' wrongful conduct

251. Kabbage further made, used, caused to be used false records or statements to get false or fraudulent claims paid and approved by the Federal Reserve, and that were material to the Federal Reserve's payment of the false claims at issue in this case.

252. Kabbage made false certifications and representations when submitting false claims for payment. Kabbage's false certifications of compliance in its PPPLF Agreement caused the Federal Reserve to approve its initial participation in the PPPLF, which allowed Kabbage to present its false claim loan applications, as alleged herein.

253. The express false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

254. Defendants made or caused to be made such false records or statement with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

255. The United States sustained damages because of Defendants' wrongful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of himself individually and acting on behalf of the United States prays that judgment be entered against Defendants as follows:

50

That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation, pursuant to the statute, with interest.

That Relator be awarded the maximum amount available under Sections 3730(d) and 3730(c)(5) of the False Claims Act.

That Relator be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

And such other relief shall be granted in the favor of the United States and the Relator as this Court deems just and proper.

Relator hereby demands a jury trial.

DATED ___15 November 2020___

Respectfully Submitted:

Michael A. Lesser, Esq. BBO# 631128
Evan R. Hoffman, Esq. BBO# 678975
**THORNTON LAW FIRM LLP**
One Lincoln Street, 13th Floor
Boston, MA 02111
(Tel.): 617-720-1333
(Fax) : 617-720-2445
E-mail: mlesser@tenlaw.com
E-mail: ehoffman@tenlaw.com

51